UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:19 CR 93 RLW (ACL) |
| DENNIS RAY PIKEY, | ) ) ) |
| Defendant. | ) ) |

### **REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is a Motion to Suppress Statements. (Doc. 24.)

As to the Motion to Suppress, Pikey requests the suppression of the statements he made to law enforcement officers on May 16, 2019 in Kansas City, Missouri. He claims that the waiver of his rights under *Miranda v. Arizona* "was not made knowingly and intelligently as required during custodial interrogations." *Id*. at p. 1. Pikey challenges the admissibility of his confession by claiming that his mental health prevented him from making a knowing waiver of his *Miranda* rights. He does not allege that his statements were made involuntarily.

The Government filed a Response in opposition to the Motion wherein it argued that "Pikey was aware of the nature of his Constitutional rights and that he knowingly and intentionally waived those rights prior to speaking" to the FBI agent. (Doc. 50 at p.

1.) The Government averred that Pikey understood the rights he was waiving and had a desire to explain his side of the story.

The parties agreed that an evidentiary hearing was not necessary. They further agreed that the Court should consider the video-recording of the interview[1] in question, as well as a Forensic Evaluation[2] concerning the Defendant's mental health.

In consideration of the pleadings identified above, as well the exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that Pikey's Motion be denied.

## I. Findings of Fact

Pikey is charged with multiple counts of Malicious Threats to Intimidate and Destroy a Building by Means of Fire for events occurring between April 6, 2019 and May 4, 2019 (Counts I-VII), in violation of 18 United States Code § 844(e). He is also charged with several counts of Transmitting Threats in Interstate Commerce via a Telephone (Counts VIII-XII) in violation of 18 United States Code § 875(c); those offenses are alleged to have occurred between April 8, 2019 and April 25, 2019. (Doc. 54.) The alleged threats were aimed at Pikey's pastor, the pastor's wife, and their adult daughter. Pikey threatened to burn down the pastor's church and sexually assault the women.

Pikey was arrested on the morning of May 16, 2019, in the Western District of Missouri. Following his arrest, officers took Pikey to an interview room. There is a

---

[1] Government Exhibit #1, hereinafter Gov. Ex. #1.
[2] Document 32, herein, filed under seal.

video-recording of the interview.  The recording is 52 minutes and 24 seconds long.  The officers and Pikey entered the room at roughly the four-minute mark and all three men leave the room less than 45 minutes later.  Pikey was questioned for approximately 27 minutes.  *See* Gov. Ex. #1 at time stamp 6:25-33:20.  During the last 12 minutes that the men were in the interview room, the FBI agent completed paperwork and secured a sample of Pikey's DNA and fingerprints.

The interview room contained a rectangular shaped table that was large enough to seat four people.  Pikey sat on one side of the table with FBI Agent Williams sitting directly across from him.  A Task Force Officer (TFO) was seated next to the Agent.  Upon entering the interview room, the tenor of the meeting was comfortable and business-like.

Agent Williams introduced himself and TFO Kyle.  He also provided Pikey with a copy of the Arrest Warrant.  After looking at the Arrest Warrant, Pikey began to speak.  He said "I never meant that, I never did anything.." *Id*. at 4:50.  Agent Williams quickly interrupted Pikey in order to advise him of the *Miranda* warning.  Agent Williams read the warning to Pikey from a printed form.   Pikey was asked if he understood his rights.  Pikey responded by saying "um hmm" and nodding his head affirmatively.  He also indicated that he was able to read and write.  Agent Williams then stated, "If you understand your rights, you can sign there."  Pikey signed the form and engaged in communication with Agent Williams.

When asked what Pikey thought the Arrest Warrant was about, Pikey immediately confessed that it was "because I threatened to burn down the church building." *Id*. at

6:30. Pikey then began to ramble about various things, including: his relationship with the victims whom he threatened, his prior criminal history, prior harassment charges that had been filed against him for communications he made to his State probation officer (whom he also described as his ex-girlfriend), his perception that he had been wrongly prosecuted for a child molestation charge, the fact he'd given up on God and was no longer going to live for Him, his belief that he had no reason to live and a desire to die, among other things.  He described his relationship with the victims and suggested that if God didn't fix things then he could die in a church fire.  Pikey was adamant that he didn't mean the things he said in the text messages and claimed if he meant what he said, he would have already done it.

Pikey was emotional at times during the interview.  He expressed a great deal of sadness regarding the difficult life he lived.  Pikey cried and shared the disappointments he experienced.  He repeatedly denied that he intended to follow through with the threats against the named victims, or that he ever truly intended to set the church on fire.  The following is an excerpt from Pikey's statements about his communications with the victims:

> I've been telling them for the last year, if God don't quick [indecipherable] and wake up, I could come down there and die in a church fire. You know? And, that's all I've been sayin', I never went down there, never carried nothin' out; never would. I just kept hopin' that they would pray and ask God to kill me because, uh… [Pikey begins to weep.]  I just, I ain't got nothin' to live for.  I don't want to live no more.  But it's nothing I would ever do, or go down and do.  I've even been down there to the building.  And, uh, told them I just want to talk.  They're okay.  You know.  But, instead they called the police and that's

> why I went to jail.  And, uh, then I was in jail, that's the second time for harass-
> ment, but this time it was with them. [gesturing to arrest warrant] The first time
> it was with my ex-PO; I mean my ex-girlfriend that's a PO.  And, uh.  So, uh.
> I just told 'em, I said, uh, I'm done tired of livin', God's gonna have to let me
> quit livin', y'all.  Come on now.  And, months went by and so I finally told
> 'em, I said I can die in a church fire, if that'll help.  If that'll help Him, you, or
> somebody. Somebody ain't, ain't prayin', somebody ain't doin' something.
> And, uh.  And, it's been that way ever since.  I'd never go down and do nothin'
> like that to them people.

*Id.* at 9:30-11:00.

During the interview, the officers and Pikey spoke in a conversational style.  They did not raise their voices rather treated each other in a cordial manner.  When Agent Williams asked Pikey questions about how his cell phone worked, Pikey examined the phone and determined that it had been placed in the case upside down.  Pikey removed the phone from the cover and successfully replaced the phone within the cover so that it could be turned on.  Pikey also discussed some of his past criminal history, including a prior harassment case involving a different victim and a child molestation case involving a prior girlfriend's daughter.  Each time, Pikey's assessment of the circumstances was that he had not committed any crimes against the alleged victims and expressed a belief that he had been mistreated by the justice system.

Part of the impetus for Pikey's request that his statements be suppressed was his *pro se* filing of a Motion to Fire Public Defender (Doc. 21) wherein Pikey expressed a belief that this Court lacks jurisdiction because his cellular phone was "wholly purchased, possessed, and used to send communications Intrastate from land based addresses not owned by the United States Federal Government." *Id.* at pp. 5-6.  Pikey's counsel argued

that Pikey does not understand the proceedings against him as he "assert[ed] facts or legal theories disconnected with reality or displaying a delusional understanding of [his] circumstances." (Doc. 24 at p. 3.) Whether Pikey fully understood the jurisdictional issues surrounding his case, the Government eventually secured a Superseding Indictment that resulted in dismissal of the original charges and inclusion of different Federal statutes. Furthermore, the new Indictment resolved the issues presented in Pikey's Motion to Dismiss (Doc. 23) which has since been found moot (Doc. 70) by agreement of the parties.

An Order for a Mental Examination of Pikey to determine his mental competency was entered on August 6, 2019. (Doc. 26.) Pikey participated in three clinical interviews during which he was interviewed for a total of approximately five hours. He had a turbulent childhood and was reared primarily by his mother. The youngest of five boys, Pikey was often neglected and physically abused by his mother. He quit school in the eighth grade and later earned his GED. He also participated in a semester of college courses, however, did not finish. Pikey served in the National Guard and the United States Navy for a few years; and he was honorably discharged. Pikey has battled depression for decades and reportedly attempted suicide more than 15 times; the last attempt was in 1988. He has concluded that "'God won't let [him] die' and therefore, there is no use to continue attempting to kill himself." (Doc. 32 at p. 4.)

The Examiner's written report reflects that Pikey was "alert and oriented to person, place, time, and situation" when he entered the facility and during clinical interviews. *Id.* at pp. 5-6. Notably, he did not "present with signs of a thought disorder,

make statements suggestive of delusions, or engage in behaviors consistent with hallucinations.  Further, he consistently denied any psychotic symptoms." *Id*. at p. 6.  The Examiner diagnosed Pikey with Persistent Depressive Disorder with intermittent/ situational anxious distress and Borderline Personality Disorder.  *Id*. at pp. 7-8.  She also concluded that Pikey does not meet the criteria for bipolar mood disorder.  She repeatedly noted that he did not appear to be experiencing a psychotic illness; he also did not present with symptoms suggestive of psychosis.  Furthermore, Pikey consistently denied experiencing any psychotic symptoms.  The Examiner noted that Pikey's clinical test results suggested he may be over-endorsing mental health symptoms, however, found that was likely representative of his personality disorder.  Additionally, Pikey "repeatedly voiced a desire to return to court and adamantly denied any concerns related to his competency." *Id*. at p. 8.  Consequently, the Examiner concluded "there was no need to further explore the possible exaggeration or feigning of mental health symptoms." *Id*.

Pikey has a long history of difficulty dealing with others and "lack of capacity to initiate and maintain meaningful relationships." *Id*. at p. 7.  Regarding the communication difficulties Pikey has experienced with his attorney and this Court, the Examiner determined "these problems are *volitional* in nature and not representative of a mental disease or defect." *Id*. at p. 10 (emphasis added).  When confronted about such behavior, Pikey was able to modify his communication style "to obtain something he viewed as [being] in his best interest." *Id*.  The Examiner reiterated Pikey's behavior "represents his personality disorder and not a mental disease or defect." *Id*.

The undersigned found Pikey competent to stand trial on October 23, 2019.  (Doc. 37.)  Both parties agreed that Pikey is in fact competent to proceed to trial in that he: 1) is not presently suffering from a mental disease or defect rendering him mentally incompetent to understand the nature and consequences of the proceedings that are pending against him, and 2) is not unable to assist properly in his own defense.

Pikey now requests suppression of the statements he made on May 16, 2019.

## II.  Conclusions of Law

It is undisputed that Pikey was properly advised of the *Miranda* warning when he was interviewed by Agent Williams.  *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).  It is also undisputed that Pikey signed a written waiver of his *Miranda* rights.  He further concedes that Agent Williams and TFO Kyle "did nothing coercive to make [his] waiver of rights involuntary."  (Doc. 24 at p. 2.)  Instead, Pikey alleges that suppression of his statements to Agent Williams is necessary, because his "mental condition [wa]s not sufficiently rational to [mak]e a *knowing and intelligent waiver* of his right to remain silent."  (Doc. 24 at p. 3; emphasis added.)  Pikey claims that "his responsiveness or lack of responsiveness to the questions asked demonstrated that he was laboring under a significant mental defect that rendered his waiver of rights neither intelligent nor knowing."  *Id*.  To support this claim, Pikey notes that his statements were generally "an explanation as to why he expected or was attempting to have God kill him and breaking down into tears."  *Id*.

The Government responded that "Pikey was able to understand his right to counsel and the right to remain silent, and able to understand the consequences flowing from

Page **8** of **12**

giving up those rights." (Doc. 50 at p. 10.)  The Government argued that "Pikey's mental health issues do not seem to have affected his ability to understand that he was waiving his right to remain silent. . .[he] seemed to want to get his version of the facts to the Agent." (Doc. 50 at p. 8.)

Based on the record of the case and the law set forth below, the undersigned concludes that Pikey's waiver of his right to remain silent was knowing and intelligent.

The Fifth Amendment provides that "no person…shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend V.   A waiver of the *Miranda* rights must be made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[3]  As described by the Court in the *Miranda* decision:

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.  For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise.

*Id*. at 467-68.

The government carries the burden of showing a valid *Miranda* waiver by a preponderance of the evidence.  *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).

The crux of Pikey's request is that his waiver was not made knowingly and intelligently based on his mental health issues.  The Eighth Circuit has recognized that validity of a *Miranda* waiver has "'two distinct dimensions'"—whether the waiver is

---

[3] There is no need to examine the voluntariness of Pikey's statement as he does not claim that his statement was made involuntarily.

voluntary and whether it is knowing and intelligent. *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (quoting *United States v. Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The Eighth Circuit described the analysis for a knowing and voluntary waiver as follows:

> In *Miranda*, the Court held that police officers must inform a suspect of his Fifth Amendment privilege against self-incrimination prior to initiating a custodial interrogation. A suspect may then waive these rights provided that the waiver is knowing, voluntary, and intelligent. *Miranda*, 384 U.S. at 475. A waiver is "knowing and intelligent" where it is *made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right*, and a waiver is "voluntary" where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception.

*Thai v. Mapes*, 412 F.3d 970, 976-77 (8th Cir. 2005) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)) (Emphasis added).

The Eighth Circuit has previously considered whether individuals who suffer from a mental disease or defect, or those who are under the influence of drugs at the time they waive their right to remain silent under *Miranda* are able to make a knowing and intelligent waiver. In *United States v. Turner*, 157 F.3d 552, 555-56 (8th Cir. 1998), it rejected the notion that a defendant impaired by low intelligence, PCP intoxication, and mental illness was not able to make a knowing and intelligent waiver of his *Miranda* rights.

Pikey presented no evidence that his mental illness caused him to be unable to make a knowing and intelligent waiver of his *Miranda* rights. Pikey's argument requires

Page **10** of **12**

the Court to examine whether his waiver was made "with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran*, 475 U.S. at 421).

There is convincing evidence that Pikey knew and understood his *Miranda* rights when he waived them on May 16, 2019. Pikey listened to the *Miranda* rights as Agent Williams read them from the form. Pikey also responded appropriately to the *Miranda* warnings. He affirmed he understood the rights by nodding his head "yes." When given the opportunity to sign the *Miranda* warning that had been read to him, Pikey examined the waiver form and signed it as a further indication that he understood his rights. The questioning that followed lasted less than 30 minutes. During that time, Pikey's faculties were intact. He made eye contact with the officers and answered the officers' questions. Although Pikey discussed other unrelated matters and expressed major discontent with perceived injustices he suffered from God and others, his communications were goal-directed in that he took advantage of his opportunity to share his side of the story. He attempted to convince the officers that he would never act on the threatening statements he texted to the victims. At times Pikey was emotional and tearful. Even so, he fully participated in the interview and fixed his cell phone when the officers were uncertain how to turn it on. Furthermore, Pikey had prior experience with the criminal justice system. Finally, the Forensic Report concerning Pikey's mental health supports that although Pikey's communication style poses challenges, he can conform his behavior to accomplish his objectives. The Examiner explained that his "characterological

difficulties" are not the result of a mental disease or defect rather "his unusual communication style."  (Doc. 32 at p. 10.)

Under these circumstances, the Court finds there is a preponderance of the evidence to support that Pikey knowingly and intelligently waived his right to remain silent and to consult with counsel.  As such Pikey's Motion to Suppress statements should be denied.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Pikey's Motion to Suppress Statements (Doc. 24) be **denied**.

Further, the parties are advised that they have fourteen days (or, not later than April 3, 2020) in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 20th day of March, 2020.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE